**RESOLUTION TRUST CORPORATION, etc., Plaintiffs, Appellees,**

v.

**Daniel M. DRISCOLL, Jr., Individually and as he is Trustee of Quinaquisset Realty Trust, et al., Defendants, Appellants.**

**No. 92–1805.**

United States Court of Appeals, First Circuit.

Heard Nov. 6, 1992.
Decided Feb. 16, 1993.

J. Daniel Lindley with whom Peter Antell and Antell & Associates, Boston, MA, were on brief, for defendants, appellants.

James H. Wexler with whom Bennett H. Klein and Kotin, Crabtree, and Strong, Boston, MA, were on brief, for plaintiffs, appellees.

Before BREYER, Chief Judge, HIGGINBOTHAM, Senior Circuit Judge,* and BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

This appeal is one branch of a complex commercial matter still pending in the district court. The case derives from a set of entangled transactions that have been further complicated by an intervening bank failure. Perceiving reasons for a prompt resolution of claims against one party, the district court entered a separate final judgment as to those claims, and this appeal followed. We affirm.

### I.

In the mid–1980's, the Fox Run Realty Trust ("Fox Run") set out to develop a residential complex in Mashpee, Massachusetts, known as "Willowbend." In December 1986, the Quinaquisset Realty Trust ("Quinaquisset") conveyed to Fox Run 152 acres of land adjoining the Fox Run holding, allowing the project to be expanded. In exchange, Quinaquisset received a large payment and the promise of a number of house lots and of condominiums or permits for them after subdivision approval. Fox Run's obligations to Quinaquisset were secured by a first mortgage on the 152 acres. At the same time, Sentry Federal Savings Bank ("Sentry") loaned Fox Run $13 million to finance Willowbend, taking back a note secured by a mortgage on Willowbend, subordinated as to the 152 acres.

In October 1987, Fox Run conveyed to Quinaquisset 20 house lots and the rights to 22 or 23 condominium permits (we are given different numbers in the briefs). The Quinaquisset mortgage on the 152 acres was discharged. Fox Run then repurchased the permit rights for cash and an unsecured $1.1 million note to Quinaquisset. Then, in April 1989, Quinaquisset borrowed $950,000 from Sentry, giving Sentry a note and depositing with it as collateral the earlier $1.1 note reflecting Fox Run's debt to Quinaquisset. At this point, Fox Run was indebted to Quinaquisset and both were indebted to Sentry.

In September 1989 Fox Run fell into default on payments to Sentry, and Sentry began to foreclose on Willowbend. In April 1990, Sentry and Fox Run entered into a settlement agreement; Fox Run agreed to convey title in Willowbend to Sentry or to Evergreen Holding Company ("Evergreen"), a wholly owned subsidiary of Sentry, and Sentry agreed not to claim under the note against two individuals who had guaranteed Fox Run's debt to Sentry. Sentry's mortgage on Willowbend, however, was not discharged; rather Evergreen took the property subject to Sentry's power to sell pursuant to the mortgage.

In the meantime, it appears that Fox Run had ceased in August 1989 to make payments to Quinaquisset on the $1.1 million note payable to Quinaquisset but held by Sentry as collateral. In November 1989, Quinaquisset fell behind in payments on its own $950,000 note to Sentry. In May 1990, Quinaquisset was in default, and Sentry brought suit on the $950,000 note in Middlesex Superior Court, claiming not only against Quinaquisset's trustee, Daniel M. Driscoll, Jr., but also against a number of individuals who had guaranteed the note ("the guarantors"). For simplicity, we will refer collectively to the trustee and guarantors, appellants in this court, as "Quinaquisset."

Sentry also proceeded with efforts to foreclose the Willowbend mortgage, seeking to sell both the property and the associated rights to the condominium permits that Fox Run had transferred to Quinaquisset and then reacquired. When Quinaquisset threatened to delay the mortgage sale by litigation, Sentry and Quinaquisset entered into an agreement on June 22, 1990. That agreement (in the first paragraph) released Sentry's mortgage on the 20 house lots previously conveyed to Quinaquisset; and Quinaquisset, subject to certain reservations of rights described in the margin, agreed (in the second paragraph) not to enjoin the foreclosure sale "or to take any further action subsequent thereto with reference to the validity of said fore-

* Of the Third Circuit, sitting by designation.

closure or the [m]ortgages relating thereto." [1] The foreclosure sale proceeded, there were multiple bidders, and at the sale Evergreen acquired Willowbend.

In September 1990, Sentry failed and the Resolution Trust Company ("RTC") became its receiver. The RTC created a new bank entity; the RTC became conservator of the new entity, which received various Sentry assets including Evergreen. The RTC, as receiver for Sentry, removed to the district court the litigation in Middlesex Superior Court brought by Sentry against Quinaquisset to recover on the $950,000 note.

## II.

On May 22, 1991, Quinaquisset filed a new pleading in the district court action, including for the first time Evergreen, now named as a third party defendant. Quinaquisset's amended consolidated answer, counterclaim and third party complaint is one of those documents that portend a lot of litigation. Claims were directed against the RTC as receiver for Sentry and conservator of the new entity, against Fox Run's trustees, and against Evergreen; there were 12 counts, alleging multiple wrongs and numerous legal theories; and the relief sought included recision of various transactions, imposition of constructive trusts, and damages.

As only the claims against Evergreen are at issue on this appeal, we confine ourselves to the procedural steps and rulings concerning it. Describing the claims against Evergreen is not easy because very little in the May 22, 1991, pleading relates directly to it. There are specific allegations against others, notably Sentry, including claims of misrepresentation and trickery in the transactions that led to Quinaquisset's discharge of its mortgage, the reconveyance of the permit rights to Fox Run, Sentry's refusal to fund interest payments by Fox Run on its debt to Quinaquisset, and alleged attempts by Sentry to cloud title to the house lots conveyed to Quinaquisset. The pleading does claim that Evergreen holds the permit rights in a constructive trust and seeks recision of the original transfer to Fox Run.

In June 1991, Evergreen filed a motion to dismiss or for summary judgment. On September 10, 1991, the district court granted summary judgment for Evergreen on the count seeking recision, concluding that the recision count sought to challenge Evergreen's title to Willowbend; this, the district court found, was inconsistent with Quinaquisset's obligations under the agreement of June 22, 1990, quoted above, that had permitted the mortgage sale to proceed. On April 21, 1992, the court granted summary judgment for Evergreen on the remaining counts. The court did not issue a written opinion but it appears that the dismissal was premised on the *D'Oench, Duhme* doctrine, which limits claims based on matters not reflected in bank records. *See D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).[2]

On May 12, 1992, the district court ordered the separate entry of judgment in favor of Evergreen on all counts, finding pursuant to Fed.R.Civ.P. 54(b) that there was no just reason for delay. We pass over related procedural history and note that the reason for the separate judgment stemmed from an earlier determination by the district court that the recision claim against Evergreen needed a prompt definitive resolution so that Evergreen could complete the sale of Willowbend to a pro-

---

1. This promise was qualified in the same paragraph by this language: "provided, however, that Quinaquisset reserves its rights, claims and remedies, if any, relating to (i).Sentry's dealings with [the two individuals who had guaranteed Fox Run's note to Sentry], and (ii) Sentry's dealings with Quinaquisset regarding the [m]ortgage being released...." In the third paragraph, the parties agreed, "with the exception of the foregoing, to reserve without prejudice their rights, claims or remedies" in the Middlesex Superior Court action.

2. The district court relied on the doctrine in a memorandum and order of July 19, 1991, granting summary judgment to the RTC on all counts except the recision request; that request had been dismissed by the court in early May 1991 based on the agreement of June 22, 1990. In an order dated May 12, 1992, the court indicated that the same reasoning was implicated in Evergreen's case.

spective buyer. Since Quinaquisset was seeking immediate appellate review of the recision claim, the district court thought it suitable that all claims against Evergreen should be before this court at the same time. Thus, the judgment dismissing all claims against Evergreen is properly before us; the balance of the litigation involving other parties remains in the district court.[3]

### III.

■ Like the district court we separate the claim for recision against Evergreen from the balance of the claims against it. Our reason for doing so is that a claim to recover property is the one line of attack made by Quinaquisset that we can imagine succeeding against Evergreen without a separate showing of wrongful conduct *by Evergreen.* Putting to one side a possible *D'Oench, Duhme* defense, there might be circumstances in which Evergreen—without any wrongdoing on its part—became a holder of property wrongfully taken by Sentry or others from Quinaquisset. In that case, whether by recision, constructive trust or some other theory or device, perhaps the property could (in some circumstances) be reached even though in the hands of an innocent possessor.

The district court foreclosed this possibility by ruling on September 10, 1991, that the June 22, 1990, agreement between the parties prevented such a recovery. Treating Evergreen's title as derived from the foreclosure sale, the district court interpreted the agreement as preventing a subsequent attack on the resulting title and ruled that "Evergreen owns the property free of any title defect...." Quinaquisset asserts that the district court misconstrued the agreement, ignoring the reservation of rights provisos.

Subject to the rights reservations, Quinaquisset agreed in the June 22 document not to obstruct the foreclosure sale "or to take any further action subsequent thereto with reference to the validity of said foreclosures or the [m]ortgages relating thereto...." Evergreen argues that "[t]he clear meaning of the [agreement] ... is that Quinaquisset agrees not to take any action to challenge or impair the foreclosure purchaser's title in Willowbend." The reservations of rights, it argues, were meant to retain Quinaquisset's damage claims, and not its right to institute a future action affecting title to Willowbend or the attendant permit rights.

We think this interpretation not quite so clear as does Evergreen, the agreement being something less than a model of clarity. There is, after all, no express promise not to "challenge or impair the foreclosure purchaser's title in Willowbend." But we agree that Evergreen's reading, endorsed by the district court, is better than any alternative reading, considering the general language used ("any further action ... with reference to the validity of said foreclosures or the [m]ortgages relating thereto") together with the purpose to protect the foreclosure-sale buyer that one would expect in such circumstances. If the "any further action" promise is read in this way, then it is easy to construe the even more general language of the rights reservations to relate to other claims such as damages.

We might be more hesitant to reach this conclusion if Quinaquisset had offered to us and the district court another reasonable reading of the "any further action" clause, or if it pointed to evidence produced or promised in the district court to show that the parties intended the clause to have some other meaning. But no other reading has been tendered and no such evidence has been proffered. Instead, Quinaquisset emphasizes the rights reservations which, as we have noted, are quite general, ought not readily be read to take back in the

---

**3.** Quinaquisset contests the Rule 54(b) certification but its argument is unpersuasive. The thread of the argument is that to enter a judgment facilitating a sale of Willowbend could impair Quinaquisset's prospects of recovering the permit rights. If so, Quinaquisset was free to seek a stay of judgment from the district court or from us. Absent a showing that would warrant a stay, the desire to facilitate a sale of assets, in connection with a bank reorganization, is a perfectly good ground for the Rule 54(b) determination. *See generally Curtiss–Wright Corp. v. General Electric Co.,* 446 U.S. 1, 8, 100 S.Ct. 1460, 1465, 64 L.Ed.2d 1 (1980).

proviso what Quinaquisset appears to have promised immediately before, and can easily be understood to refer to other remedies such as damages.

Given the district court's interpretation which we sustain it becomes fruitless for Quinaquisset to argue, as it does at length, that it might otherwise have a claim to recover the permits from Evergreen. Assuming it had such claims, whether by recision or constructive trust, it has surrendered them by the agreement. This court need not decide Quinaquisset's alternative, last ditch and facially doubtful argument that Evergreen never acquired the permits at all (allegedly because their acquisition by Fox Run in October 1987 was "illegal"); the claim cut off by the judgment is Quinaquisset's claim to recover property from Evergreen. The judgment does not address property that Evergreen never received in the foreclosure.

## IV.

■ Turning now to the remaining claims against Evergreen, we sustain their dismissal on a ground not adopted by the district court. *See Doe v. Anrig,* 728 F.2d 30, 32 (1st Cir.1984) (court "free to affirm ... on any ground supported by the record"). Both parties treat the district court as having dismissed those claims in reliance on the *D'Oench, Duhme* doctrine, and we believe this is so. But there is no district court opinion applying *D'Oench, Duhme* to Evergreen. Although the district court did discuss the doctrine as applied to the RTC, Quinaquisset seeks to distinguish Evergreen's status under the doctrine. We think that there is in the foreground of this case another basis for sustaining the dismissal—the failure to state a claim against Evergreen—and we rest our affirmance on that basis.

Evergreen is admittedly a separate corporation and was apparently not a party to Fox Run's acquisition of the permits or the Fox Run–Sentry agreement. The complaint may in a literal sense "charge" Evergreen with wrongs such as fraud, misappropriation, and unfair competition; but no facts are ever alleged that connect Evergreen with the wrongful acts described. The complaint does nakedly assert that Evergreen is the "alter ego" of Sentry, the implication being that it is thereby responsible for Sentry's conduct. Yet Quinaquisset alleges no facts that, if proved, would even arguably permit a court to impose liability on Evergreen for the acts of its parent under an alter ego theory. *See generally United Electrical, Radio and Machine Workers of America v. 163 Pleasant Street Corporation,* 960 F.2d 1080, 1092 (1st Cir.1992).

■ Similarly, the complaint asserts in one conclusory sentence that Fox Run's obligations to Quinaquisset were "assumed by Sentry or Evergreen" when Willowbend was acquired. Nothing else in the complaint identifies any act or document reflecting such an assumption by Evergreen of Fox Run's debt to Quinaquisset or remotely suggests the factual basis for this claim. Factual allegations in a complaint are assumed to be true when a court is passing upon a motion to dismiss, but this tolerance does not extend to legal conclusions, *Kadar Corp. v. Milbury,* 549 F.2d 230, 235 (1st Cir.1977), or to "bald assertions." *Chongris v. Board of Appeals of the Town of Andover,* 811 F.2d 36, 37 (1st Cir.), *cert. denied* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987).

It is, of course, true that at the start of complex litigation a party may not have all the facts, so courts normally hesitate to dismiss under Fed.R.Civ.P. 12(b)(6) at the outset. At the start, a reasonable basis for belief and an outline of what one might reasonably hope to prove may suffice to permit discovery and ward off premature motions to dismiss. But Quinaquisset's complaint against Evergreen is deficient; this litigation has persisted for almost two years; and yet even now Quinaquisset is still unable to explain what exactly it is that Evergreen did that is wrongful. The only claims at issue on this appeal are those relating to Evergreen. No amount of embellished attack on Fox Run, Sentry or the RTC can replace what Quinaquisset has still not supplied: a single, coherent, specific description of what Evergreen has done that is wrongful.

Our appraisal of Quinaquisset's claims against Evergreen is without prejudice to whatever claims it may assert against oth-

ers. Part of its predicament may be of its own making: for unexplained reasons, it released a mortgage on part of Willowbend, reconveyed valuable permit rights to Fox Run, and took back an unsecured note on which Fox Run later defaulted. On the other hand, this misstep, if such it was, does not preclude the possibility that out of the welter of surrounding events a claim was created against other active participants. Whether this is so, and if so whether such a claim is nevertheless barred by *D'Oench, Duhme,* are matters on which we have no occasion to pass at this time.

We conclude that, apart from seeking to recover property from Evergreen, Quinaquisset has failed to state a claim upon which relief can be granted. The property recovery claim is barred by the agreement for reasons already stated. Thus the balance of the claims fail under Fed.R.Civ.P. 12(b)(6) and on this ground we affirm the district court's dismissal of those claims. It will be time enough to consider *D'Oench, Duhme* when the rest of this litigation, now nine-tenths submerged like the proverbial iceberg, reaches this court.

*Affirmed.*